1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4

5

6    -----------------------------------
                                       :
7    GILBERT JAMES, et al., on         :
     behalf of themselves and all      :   Civil Action No.
8    others similarly situated,        :   3:12CV902
                                       :
9    vs.                               :
                                       :   September 16, 2013
10   EXPERIAN INFORMATION SOLUTIONS,   :
     INC.                              :
11   -----------------------------------

12

13

14      COMPLETE TRANSCRIPT OF THE CONFERENCE CALL

15        BEFORE THE HONORABLE ROBERT E. PAYNE

16           UNITED STATES DISTRICT JUDGE

17

18   APPEARANCES:

19   Leonard A. Bennett, Esquire
     Matthew J. Erausquin, Esquire
20   Consumer Litigation Association, PC
     12515 Warwick Boulevard
21   Suite 100
     Newport News, Virginia  23606
22   Counsel for the plaintiff;

23

24              Peppy Peterson, RPR
                Official Court Reporter
25           United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Daniel J. McLoon, Esquire
      Jones Day
 3    555 South Flower Street
      Fiftieth Floor
 4    Los Angeles, California  90071

 5    Joseph W. Clark, Esquire
      Edward M. Wenger, Esquire
 6    Jones Day
      51 Louisiana Avenue, N.W.
 7    Washington, D.C.  20001
      Counsel for the defendant
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3              THE COURT:  Hello.  This is James against

4     Experian Information Solutions, civil 3:12CV902.  Who is

5     here for whom?

6              MR. CLARK:  Good afternoon, Your Honor.  Joseph

7     Clark, Dan McLoon, and Edward Wenger on behalf of

8     Experian.

9              MR. BENNETT:  Your Honor, it's Len Bennett or

10    Leonard Bennett and Matthew Erausquin on behalf of

11    plaintiff.

12             THE COURT:  All right, I confess to not

13    understanding where you are after having read the status

14    reports filed on the 12th and the 13th of September.  Are

15    you in agreement that you have resolved disputes over

16    interrogatories of the plaintiff six, three, 14, and 20?

17    Mr. Bennett?

18             MR. BENNETT:  Your Honor, we are.

19             THE COURT:  All right, Mr. McLoon?

20             MR. McLOON:  Yes, Your Honor.

21             THE COURT:  Okay.  Are you in agreement that you

22    have resolved request for production of the plaintiff

23    numbers four, nine, ten, 11, and 19, Mr. Bennett?

24             MR. BENNETT:  We are, Your Honor, the plaintiff

25    is.

1          THE COURT:  Mr. McLoon?

2          MR. McLOON:  Yes, sir.

3          THE COURT:  As to plaintiff's interrogatory

4   number five and request for -- you see, Mr. Bennett, what

5   I just asked you is if you all were in agreement on

6   document productions four, nine, ten, 11, and 19, but you

7   say -- and you say you are in agreement, but you say later

8   in the sentence that there will be further discussion over

9   request for production nine.  How can that be?  You see

10  the problem the simple old man has?

11         MR. BENNETT:  Your Honor, we have agreement.  The

12  defendant has made representations as to what it intends

13  to produce.  The defendant has not produced its actual

14  substantive responses to these documents.  It's

15  represented that it is going to start this week, and we'll

16  have a rolling production through the first week of

17  October, and our qualification is --

18         THE COURT:  When will production be ended?  What

19  is the last day of the first week of October?

20         MR. CLARK:  Your Honor, Joe Clark here.  That's

21  the goal.  I mean we want to produce as quickly as

22  possible, and we're working with our client to do that --

23         THE COURT:  Mr. Clark, we are beyond goal.  We

24  are having deadlines, and if you fail to meet the

25  deadline, you will be in default.  This has been going on

1  for entirely too long, and we are through with goals.  Is
2  that clear?
3          MR. CLARK:  Yes, sir.
4          THE COURT:  The deadline is the end of the first
5  week of October.
6          MR. BENNETT:  October 4th, Your Honor.
7          THE COURT:  You have to do what is necessary to
8  meet that deadline, Mr. Clark.  If that means putting more
9  of your lawyers on the job, more of your client's people
10  on the job, that's what it takes; okay?
11          MR. CLARK:  Yes, sir.
12          THE COURT:  Now, Mr. Bennett, you say as to
13  interrogatory number five, it looked like that that's
14  satisfied.  Then you later say in a separate sentence that
15  interrogatory five requires further discussions.  So I'm
16  having a little trouble with that one, too.  Where do you
17  stand now on interrogatory five and request number nine?
18  Are you in agreement; yes or no?
19          MR. BENNETT:  We are, Your Honor.
20          THE COURT:  All right, Mr. McLoon?
21          MR. McLOON:  Yes, sir.
22          THE COURT:  Okay.  Now, you are saying it is
23  possible it could resurface if something else by way of
24  production indicates that they haven't produced the right
25  thing; is that right?

1           MR. BENNETT:  That's correct, Judge.

2           THE COURT:  Okay.  Now, interrogatory seven, 11,

3    15, 16, and 18 and request for production number seven,

4    15, 18, 26, 28, 29, and 31 are fully at odds, and you say

5    including whether the defendant has the right to

6    supplement its privilege log, and in the report of

7    Experian, it says that that's a moot issue -- I mean a

8    premature issue because they haven't identified -- claimed

9    any privileges, but Experian doesn't address whether they

10   say that you are, in fact, at odds over all those

11   enumerated interrogatories and requests that I just

12   listed.

13          That's a lot of interrogatories and document

14   productions.  I really don't understand why it's necessary

15   to be dealing with these, but I guess I have no choice but

16   to deal with them one at a time.  I'm not -- I'm hopeful

17   that perhaps you can get these things sorted out.

18          Where are the interrogatories?  Interrogatory

19   number -- what is the first one that's at odds here,

20   number?

21          MR. BENNETT:  Seven, Your Honor.

22          THE COURT:  Seven, and you all don't have any

23   agreement on.  "Describe and explain the complete process,

24   company rules, policy, and procedures by which your

25   computer hardware and software systems match and combine

1  tradelines and/or personal identifying information within
2  a consumer's credit files, and identify all documents that
3  explain or regard the same and provide the names of at
4  least five persons with substantial knowledge."  What is
5  the problem with that one?
6          MR. McLOON:  Your Honor, this is Dan McLoon.
7  This is essentially asking for every single piece of paper
8  having to do with how one of the largest computer systems
9  in the world operates.
10         THE COURT:  No, it isn't.  You are over-reading
11  it if you read it that way.
12         MR. McLOON:  But more importantly, Your Honor, it
13  is really asking for a significant amount of detailed
14  information on issues that are not even in dispute in this
15  case.  This is not a case that's going to turn on whether
16  Experian can properly find a consumer's file with less
17  than full identifying information.  There is simply no
18  dispute about that.
19         THE COURT:  Well, there is, too.  You say -- you
20  won't even give them information that they need to
21  identify people, and you say it's protected.
22         MR. McLOON:  Your Honor, Experian has had a
23  policy for certain types of disputes only that without a
24  social security number, we have two problems.  Number one,
25  the people who are being asked to determine who owns the

1   account are telling us, we can't figure that out without

2   you giving us the full social.  It doesn't turn on

3   Experian's system.  It turns on what the third parties

4   have told us they need in order for them to do the work

5   that the FCRA requires them to do.

6          Your Honor understands that the way the FCRA is

7   laid out, when a consumer comes to Experian and disputes

8   something that Experian is reporting, the statute says

9   Experian has to go back to its source and convey to the

10  source the consumer's dispute and ask the source to

11  confirm the accuracy of the information.  The policies

12  that the plaintiffs are challenging was derived because of

13  what the sources were telling us.

14         THE COURT:  Well, if the source can't identify it

15  -- when you are told to go back to the source and the

16  source can't identify it, then you have no business

17  reporting on it at all, because all of a sudden you know

18  you can't be sure that it's the right person.  So you just

19  deep-six that from your, from what you report on and say,

20  sorry, we're not reporting on that.

21         MR. McLOON:  Your Honor, it is not that simple.

22         THE COURT:  Well, it is that simple.  It's going

23  to be real simple, Mr. McLoon, it can be that simple, and

24  you all try to make everything complicated because you try

25  to put a lot of players on the field, run a screen pass,

1   and get by, go to the end zone with all the blockers in

2   the way.  That's just not going to work.

3         MR. McLOON:  Your Honor, I absolutely respect

4   your position, but if you could just give me a minute.

5         THE COURT:  I haven't got that many minutes in my

6   life to go through all the dodges that you all are putting

7   out.

8         MR. McLOON:  Your Honor, I'm an officer of the

9   court.  I am not creating any dodge.  This is a

10   complicated matter that there are many issues that our

11   client is trying to grapple with that are completely

12   legitimate issues.  It has nothing to do with dodging

13   anything.

14         It is absolutely in the public's best interest

15   that when a consumer has derogatory credit in their actual

16   history, that we accurately report that.  There is a whole

17   industry out there that's trying to subvert that.  It's

18   called credit repair, and it is a common credit repair

19   technique to write a letter to a credit bureau and say, I

20   don't have this account, take it off my credit report.

21         There is a whole industry out there that we would

22   provide evidence on at trial that is dedicated to do that,

23   and when they succeed, honest consumers who pay their

24   bills on time have to pay higher costs of borrowing

25   because of that.  It is in no one's interest, Your

1  Honor --

2          THE COURT:  You don't have to --

3          MR. McLOON:  -- to allow credit repair to go on.

4          THE COURT:  We're not trying credit repair.

5  We're trying what you do.

6          MR. McLOON:  But, Your Honor, that is the exact

7  process that the credit repair clinics follow.  They

8  submit these exact kind of disputes to Experian.

9          THE COURT:  Does this case involve a credit

10  repair?

11          MR. McLOON:  We believe it does.

12          THE COURT:  Which one?

13          MR. McLOON:  We haven't taken the plaintiffs'

14  deposition.  We believe the named plaintiffs in some cases

15  were trying to get accurate accounts off of their credit

16  reports.

17          THE COURT:  What reason do you have to believe

18  that?

19          MR. McLOON:  Because of the language that they

20  use.  They used language that we have seen credit repair

21  clinics use.  They use very tricky language saying, I

22  don't owe anything to this entity, so take it off my

23  credit report.

24          Well, in fact, I think when we take the

25  depositions, we're going to prove they, in fact, did have

1   accounts with those entities --

2          THE COURT:  Why would you ever have to go to a

3   lawsuit and get to that point?  The fact of the matter is,

4   if they tell you they don't owe it, you can't be reporting

5   it as in credit default.  You have to then go find out

6   what's going on, and that's the problem.  You don't want

7   to do that.  You don't want to spend the money to do it.

8          MR. McLOON:  Your Honor, it's absolutely false.

9   The evidence is going to be the policy we're following is

10  more expensive than the policy the plaintiffs would like

11  us to follow.  It costs us more to do it the way we're

12  doing it.

13         THE COURT:  Well, let's take number seven.  You

14  need to describe and explain the complete process, company

15  rules, policy, and procedures by which your computer

16  hardware and software systems match and combine tradelines

17  and/or personal identifying information within a

18  customer's credit file.

19         MR. McLOON:  Your Honor, what that is is a series

20  of mathematical algorithms.

21         THE COURT:  You have to do that, figure out a way

22  to express it; all right?

23         MR. McLOON:  We can describe it in a high-level

24  English language, but, Your Honor, the plaintiffs don't

25  intend to use this as evidence.  There's no way they could

1   present a series of algorithms to the jury.

2           MR. BENNETT:  We absolutely -- I'm sorry.  I

3   don't mean to interrupt.  I disagree strongly with a large

4   part of what Mr. McLoon has said.  We absolutely intend to

5   use that information, and every other bureau has produced

6   it.  Experian has represented that it is its prized crown

7   jewels even though we have a protective order.

8           The question in this case, Your Honor, is a big

9   issue, a big issue as to merit and as to willfulness, is

10  why doesn't Experian apply the same "you have to provide

11  your full social security number when a creditor who pays

12  it money for a credit report buys a credit report"?

13          Why will Experian provide a report on name and

14  address but the consumer asks to make a dispute, not to

15  request a copy of a credit report but to make a dispute

16  just like all the individuals in this case that

17  objectively did not owe this money.  The Court is familiar

18  with the Midland litigation --

19          THE COURT:  You're getting off the track.  You're

20  getting off the track.

21          MR. BENNETT:  I'm sorry.

22          MR. McLOON:  Your Honor, he's misstated our

23  policy.

24          THE COURT:  Shhh.  Please.

25          MR. McLOON:  -- not our policy to say we have to

1   have a social --

2         THE COURT:  Please.  We're in class certification

3   discovery; right?  Mr. Bennett?

4         MR. BENNETT:  We are, but also the defendant

5   wanted to preserve willfulness as an argument in phase one

6   as well.

7         THE COURT:  You mean the defendant wants

8   willfulness litigated?

9         MR. McLOON:  We would move for summary judgment,

10  Your Honor.

11        THE COURT:  Then you have to provide discovery on

12  it, and you have to answer number seven.  And you have --

13  you are just going to do it.

14        MR. McLOON:  Your Honor, this is Dan McLoon, and

15  I apologize for taking your time.

16        THE COURT:  It's not taking my time.  It's taking

17  the time needlessly.

18        MR. McLOON:  I don't believe it's needless.  I'm

19  an officer of this court, and I'm telling you I don't

20  believe it's needless.

21        THE COURT:  Okay, Mr. McLoon, you have had your

22  say, and answer that.  If you can't answer, if you say you

23  have to provide algorithms, then perhaps you have to have

24  an expert help you prepare your answer, but I would assume

25  that the plaintiff, from what Mr. Bennett has said, is

1    that the plaintiff will then take what you have and use

2    that as it has in the past with its own experts.

3            MR. McLOON:  Your Honor, it will not happen.

4    This is not going to be a case that's going to turn on

5    matching algorithms.  It has nothing do with what's in

6    dispute here.

7            THE COURT:  Mr. McLoon, answer it.  How long do

8    you need to answer it?

9            MR. McLOON:  We would need at least 30 days.

10           THE COURT:  You can have 15.  He's been piddling

11   around here discussing this issue and talking about this

12   issue for months.  That's a four-corners offense.

13           All right, now, the next part of interrogatory

14   seven is, "and identify all documents that explain or

15   regard the same and provide the names of at least five

16   persons with substantial knowledge of these systems and

17   processes."  Is there any reason you can't provide the

18   names of five people who have substantial knowledge of the

19   processes?

20           MR. McLOON:  I don't believe there are five

21   people.  I think it's probably about two.

22           THE COURT:  Can you provide the names of all, and

23   if it turns out that there are more than five, you do at

24   least five.  So the names of all or five if there are

25   five.

1          MR. McLOON:  Your Honor, I don't think there is

2     any problem with that.  I think we put that into our

3     status report.  We are happy to provide the names that are

4     available.

5          THE COURT:  "All documents that explain and

6     regard the same," meaning the policies, procedures, et

7     cetera.  Now, Mr. Bennett, you've been around here long

8     enough to know that that's very broad.

9          MR. BENNETT:  We've narrowed it, Your Honor, in

10    the meet-and-confer process.  Their actual -- the matching

11    rules are reduced to paper by this defendant, and it is

12    those documents that we have clarified in our multiple

13    meet-and-confer sessions that we are asking.

14         THE COURT:  And they're called matching rules?

15         MR. BENNETT:  It would be the matching rules,

16    Your Honor.

17         THE COURT:  And that satisfies that clause of

18    number seven?

19         MR. BENNETT:  Yes, Your Honor.

20         THE COURT:  Do you agree with that, Mr. McLoon?

21         MR. McLOON:  I don't believe those documents

22    exist.  If they exist, I'm happy to produce them.

23         THE COURT:  Well, he said that you all have

24    agreed in the meet-and-confer process that they do exist

25    and that's how -- and that you agree to produce them.  Now

1   you are saying --

2           MR. McLOON:  I have to defer to Mr. Clark,

3   because I've been out of town for the last couple of days.

4   I don't believe that was an agreement --

5           MR. BENNETT:  Judge, that wasn't what I meant.  I

6   said the plaintiffs have clarified that we would narrow

7   this request to that category or that subset of documents.

8   The defendant has taken the position from the beginning

9   that they will not produce --

10          MR. McLOON:  We don't think they exist in that

11  form, Your Honor.

12          THE COURT:  How do they exist?

13          MR. McLOON:  I believe they're computer programs.

14  I think they're software.

15          MR. CLARK:  They are algorithms, mathematical

16  formulas.

17          THE COURT:  Then you produce the algorithms and

18  somebody to explain them, and you can take the deposition

19  of someone to explain them.  Have your expert sit in on

20  the deposition, help you with the questions.  But if they

21  do exist in any form other than the algorithm, other than

22  the computer algorithms, you provide those documents to

23  which he's narrowed the request.  That's number seven.

24  Number 11.

25          MR. BENNETT:  We've narrowed number 11 to -- the

1    dispute is whether or not --

2            THE COURT:  Tell me how you've narrowed it by

3    word.  How does it read now?

4            MR. BENNETT:  We've asked for all of the lawsuits

5    and complaints made to the Federal Trade Commission or the

6    Consumer Financial Protection Bureau.  We've narrowed that

7    to within the last year and only those that pertain to the

8    consumers' claim that Experian did not conduct the

9    investigation the FCRA requires, and --

10           THE COURT:  That's what it says in the last

11   clause, "wherein it was alleged that Experian failed to

12   conduct a proper investigation or reinvestigation with

13   respect to the information."

14           MR. BENNETT:  Yes, Your Honor, but we narrowed it

15   by time, so a year before the complaint.

16           THE COURT:  What is the date?  Since when, since

17   what date?

18           MR. BENNETT:  Judge, we would ask for August 1,

19   2012, forward.

20           THE COURT:  Are you in agreement with that?

21           MR. CLARK:  Yes, Your Honor.  We produced a list

22   of federal cases --

23           THE COURT:  Excuse me just a minute.  August what

24   date, 1?

25           MR. BENNETT:  August 1.

1          THE COURT:  2012.  So it's -- this is complaints,

2     investigations, inquiries, administrative proceedings, and

3     civil or criminal actions made or brought against you in

4     which you were involved since August 1, 2012.

5          MR. CLARK:  My understanding was that plaintiffs

6     had limited this to civil complaints, not criminal

7     complaints.

8          THE COURT:  Is that correct -- are there criminal

9     complaints?

10         MR. BENNETT:  No.

11         THE COURT:  So you agree with that, Mr. Bennett?

12         MR. BENNETT:  Yes, Your Honor.

13         MR. CLARK:  The other issue, and Matt's

14    correspondence to us is that, you know, he wanted any

15    attorney general complaints from any of the 50 states, and

16    that was beyond the scope of the several meet-and-confers

17    that we had on this particular subject wherein we had, I

18    thought, agreed to limit it by time, and we agreed to

19    limit it by government agency, the FTC and CFPB as well as

20    any federal cases.

21         So I think that's really how this one landed back

22    on your radar, and if they're going to pull the attorney

23    general complaints from any of the 50 states, I mean, that

24    would be consistent with what we thought we agreed to

25    earlier.

1          MR. BENNETT:  We're not going to ask for --

2          THE COURT:  I want to get the wording down for an

3    order.  The problem is you all yap and talk, but we've got

4    to reduce it to an order.

5          Identify any and all complaints, investigations,

6    inquiries, administrative proceedings, and civil actions

7    made or brought against you or in which you were involved

8    since August 1, 2012, that was instituted by, and where do

9    we go from there?

10          MR. BENNETT:  We would -- Your Honor, we would

11    ask for by the Federal Trade Commission or the Consumer

12    Financial Protection Bureau.

13          THE COURT:  Instituted by the Federal Trade

14    Commission or what?

15          MR. BENNETT:  We would -- actually we would say

16    by or through, which would still be a subset of the

17    current draft 11, by or through the Federal Trade

18    Commission or the Consumer Financial Protection Bureau.

19          THE COURT:  And then it will be relating to --

20          MR. BENNETT:  We would actually narrow it, so we

21    would skip that part of the text and take it to "wherein

22    it was alleged."

23          THE COURT:  All right.  Are we in agreement now,

24    gentlemen?

25          MR. CLARK:  Your Honor, I'd like to know whether

1   or not to satisfy this interrogatory and RFP if we've got

2   to produce the actual paper complaints that these various

3   people filed or would have provided.  The FTC has the

4   actual FTC complaints.

5            THE COURT:  You have a copy of it.

6            MR. McLOON:  Your Honor, they are not in a way

7   that we can access them.  We keep a log of them.  We can

8   produce the log, but, you know, if there's 10,000, it

9   could take us a year to find them.

10           THE COURT:  That answer is not acceptable.  Try

11  again.

12           MR. McLOON:  Your Honor, they're just not sorted

13  in a way that we can look for them.  We don't keep a file

14  cabinet of all complaints from the FTC.  If we did, it

15  would be easy, we'd be happy to do it.

16           We're not trying to obfuscate here.  We're not

17  trying to escape anything.  It's just not in a form we can

18  find them.  We can give them the names.  If they want a

19  sample, we'll be happy to pull a sample for them.

20           THE COURT:  Where are you going to pull the

21  sample from?

22           MR. McLOON:  Well, we would have to do the manual

23  searches.  If they say, give us a sample of 20 names, we

24  have to do a manual search.  Each manual search probably

25  takes 20, 25 minutes.

1          THE COURT:  A manual search of what?

2          MR. McLOON:  They are stored by consumer name by

3   date that they come in, and they are stored on a system

4   where you have to know the consumer's name and the date

5   that it came in, and you go to that place and you look for

6   it, and it takes a long time.

7          THE COURT:  Where are all those documents stored?

8          MR. McLOON:  In Texas.

9          THE COURT:  In boxes?

10         MR. McLOON:  Well, I think there are some --

11  depending on which date you are talking about, there's

12  electronic copies, but they're just not in a searchable

13  database where you can plug in, give me every FTC

14  complaint dealing with a dispute.  They're not organized

15  that way.  They're not searchable that way.

16         THE COURT:  That doesn't mean that you don't have

17  to produce them.

18         MR. McLOON:  Your Honor --

19         THE COURT:  That means --

20         MR. McLOON:  -- I am telling you --

21         THE COURT:  Mr. McLoon, please.

22         MR. McLOON:  -- happy to give them the list

23  because we can produce the list electronically.  If

24  there's some sample from the list they'd like to look at,

25  we can do it, but to pull thousands and thousands of

1    disputes that have nothing to do -- Your Honor, are we

2    really going to litigate thousands of other people's

3    disputes that have nothing to do with this case?  These

4    involve disputes that have nothing to do with whether or

5    not there's a complete social security number provided.

6              That's the issue in this case.  We get thousands

7    of disputes on completely different issues every day, and

8    we'd be pulling thousands and thousands of disputes that

9    have nothing to do with this case.

10             THE COURT:  Do you want to narrow it to the ones

11   where the social security numbers are at issue?

12             MR. McLOON:  The problem is we have no way of

13   identifying those without doing a manual search and

14   pulling every one out and looking at it.  They're just not

15   sorted that way.

16             THE COURT:  Mr. McLoon, that is precisely the

17   point.  You use great words like thousands and many hours

18   and so forth, but if you want me to do the balancing

19   that's required in the discovery process, it is your

20   burden to tell me how many hours, how long will it take,

21   et cetera.

22             MR. McLOON:  There would be over 60,000 total

23   disputes of this nature, and each one would take 15 to

24   20 minutes to find.

25             THE COURT:  Well, then you figure out how long

1    all that is and tell me what it costs, and we'll deal with

2    it.  That's the way you deal with this kind of problem,

3    instead of just complaining about it.

4            MR. McLOON:  I've been trying to work with

5    counsel who we have had, generally, a good relationship

6    with, and I don't think they're accusing me of lying to

7    them when I say there is no way for us to easily recover

8    those.

9            I've explained to them what we can produce.  I

10   certainly told them, when we were meeting in person after

11   you ordered us to do that over the videoconference, that

12   we can pull the electronic examples, and if there's some

13   reason that they want to pull a sample of all those

14   disputes, that's fine.

15           I don't think there's going to be any genuine

16   issue that we weren't aware that there was this issue, and

17   we are going to have to explain at trial why it was that

18   we were grappling with lots of competing interests,

19   including the interests of consumers to do legitimate

20   disputes, and we tried to balance all those interests, but

21   that has nothing to do with us claiming that we were

22   unaware of the issue.  So, I mean, I don't think there's

23   any dispute --

24           THE COURT:  Will you stipulate that you were

25   aware of these disputes?

1          MR. McLOON:  We were aware of concerns of

2     consumers who wished to produce disputes without providing

3     full socials, yes.  We will stipulate to that.

4          MR. BENNETT:  Your Honor, we've offered them

5     stipulations regarding --

6          THE COURT:  Mr. Bennett, what is wrong with that

7     stipulation?

8          MR. BENNETT:  Because it doesn't address Rule 23.

9     We aren't going to have a problem proving willfulness, in

10    my opinion, and I would never call Mr. McLoon a liar or

11    another opponent a liar, particularly in front of the

12    Court, but I absolutely find it an incredible and

13    unbelievable assertion that we've narrowed this list --

14    it's not 60,000.

15         We've narrowed the Consumer Financial Protection

16    Bureau list to just since August of '12.  We've given the

17    defendant -- the CFPB has a summary that doesn't provide

18    the details.  It has the type of dispute, for failure to

19    investigate, for example, to Experian and has a number

20    assigned and a date.  We've given the defendant that list,

21    which is nowhere close to the 60,000 Mr. McLoon suggests,

22    and they can identify by date.

23         If it's anything like Equifax and TransUnion, the

24    disputes that come in through the government regulators

25    are directed to a specific source at Experian.  They're

1    not, for example, sent to Chile, and those would be easily

2    isolated.

3             MR. McLOON:  How many are there?

4             MR. BENNETT:  There are several thousand.

5             MR. CLARK:  There are 3,000 in the list we sent

6    you.

7             MR. BENNETT:  And that was not August of 2012.

8    It was even broader.  The August 12 is more narrow than

9    that.

10            MR. McLOON:  So to pull every one of those at

11   20 minutes per is 5,000 hours.

12            MR. BENNETT:  If your suggestion is that it would

13   take you 20 minutes, which is ten times or more than that

14   of what the individuals at each company would take if

15   they're going to actually do a full-blown dispute, and

16   regardless, Your Honor, there is not an objection that is

17   in the papers that would -- and certainly there's none

18   that's been substantiated at all other than what I think

19   to be the --

20            THE COURT:  What are you talking about, there's

21   not an objection?  There's a whole bunch of objections.

22            MR. CLARK:  We objected because we thought this

23   would be unduly burdensome, and these modifications are

24   helpful.  Your Honor, what I'm wondering is if you would

25   permit us to provide the FTC list, which I think we can do

1    here in short order, and allow us to do, you know, perhaps

2    a random sampling or pull from that list so we're not

3    going after some 3,000.

4            We can work with plaintiffs.  They can identify a

5    handful or number, and we could try to pull those and get

6    those ones crossed off.  We've been working on preparing a

7    list --

8            THE COURT:  What is the basis of asserting it

9    takes 25 minutes to do this once you are into the

10   electronic database or the document boxes where these are

11   kept?

12           MR. McLOON:  Your Honor, this is Dan McLoon.

13   That is my experience having sat down and watched someone

14   do it.  Now, if there is a faster way to do it, I'm

15   unaware of it.  Joe, are you aware of a faster way to do

16   it?

17           MR. CLARK:  No, I am not.

18           MR. McLOON:  The reason that, Len, it takes

19   longer is because the average dispute, when a consumer

20   writes a dispute, the agent is not pulling copies of prior

21   correspondence from the consumer.  That's what has to be

22   done here.

23           It isn't just finding the consumer's file.  Yes,

24   the consumer's file can be found in a matter of a couple

25   of minutes.  If you want the DR logs from those consumers,

1    if you want the DR logs from those consumers, we could do

2    it very quickly.  You are right.  It would be a couple

3    minutes per times 3,000, but that's still an awful lot of

4    time.

5              MR. BENNETT:  Your Honor, we offered Mr. McLoon,

6    we offered the defendant, and I haven't talked to Mr.

7    McLoon since the first meet-and-confer right after the

8    very first hearing, we have offered the defendant's

9    counsel a stipulation that if we were to have these

10   records, that we would be able to identify specific

11   consumers as members of the class, and the defendant

12   refuses that stipulation and wants to claim it's really

13   difficult because if you had to look at the individual

14   records how impossible it would be.

15             At the same time, with respect to this

16   interrogatory and related RFP and another one for which

17   there was no burdensomeness objection related to the class

18   list information, in both instances, the defendant wants

19   to have its cake and eat it, too.  It wants to say, we're

20   not going to give you the underlying documents, but if you

21   had to use those underlying documents, which we're not

22   going to share with you, nobody would be able to ascertain

23   and identify a class.

24             MR. McLOON:  I don't believe that's our position.

25   Our position is that if you looked at the documents --

```
1              THE COURT:  Slow down.

2              MR. McLOON:  Our position is it's very

3     time-consuming to find those documents.

4              THE COURT:  Yes, but then you're going to use

5     that as the basis as opposing class certification.

6              MR. McLOON:  We will not use that it takes time

7     to find the documents as a basis to oppose class.

8              THE COURT:  Anything else?

9              MR. CLARK:  On this point?

10             THE COURT:  On that issue, yes.

11             MR. CLARK:  Yeah, Len has offered a stipulation

12    here, and he's done this --

13             THE COURT:  Who is that; Mr. Clark?  Give us your

14    name, if you will.

15             MR. CLARK:  Joe, Joe Clark.  It would be helpful

16    for us to actually see the draft stipulation before we

17    agree to it.  I think some of these we may have been able

18    to resolve by way of stipulation, but it's hard to sort of

19    agree to something in principle or theory, and any time

20    we've asked for a stipulation, we've tried to draft

21    something up so we can trade copies and understand what it

22    is we're stipulating.

23             THE COURT:  That's something you could have asked

24    for in your discussions, and apparently you didn't, so

25    that's it.
```

1          All right, on 11, it's been modified to read,

2     "Identify any and all complaints, investigations,

3     inquiries, administrative proceedings, and civil actions

4     made or brought against you in which you were involved

5     since August 1, 2012, that was instituted by or through

6     the FTC, Federal Trade Commission, or Consumer" what is

7     it?

8          MR. McLOON:  Financial Protection Bureau.

9          THE COURT:  "Federal Protection Bureau wherein it

10    was alleged that Experian failed to conduct a proper

11    investigation or reinvestigation with respect to the

12    information."

13         Now, the wherein clause, Mr. Bennett, seems to

14    be -- how is that tethered to this particular case?

15         MR. BENNETT:  Because the violation in this case

16    is just that.  It is that the consumer made the dispute,

17    and defendant refused to do an investigation.  The

18    Consumer Financial Protection Bureau reasons that are --

19    like they're multiple-choice reasons.

20         The one reason that most closely fit this of all

21    the different ways that a consumer or reasons a consumer

22    might make a CFPB dispute is the one that we've described

23    in here.

24         THE COURT:  Well, what is it?  It's not

25    described.

1          MR. BENNETT:  It's that Experian failed to

2     conduct a proper investigation with respect to the

3     consumer's dispute.

4          THE COURT:  How does that fit the class issue?

5     You are talking about class discovery now.

6          MR. BENNETT:  Yes, Your Honor.  Because the

7     class -- the question is that the consumer disputes were

8     homogenous enough for purposes of Rule 23 analysis that

9     they all received the same two dispute or response forms

10    from Experian.

11         THE COURT:  Why wouldn't it be more reasonable to

12    narrow this to wherein the dispute was X which is what

13    these people are complaining about?

14         MR. McLOON:  Failed to conduct an investigation

15    because you didn't provide a full social.

16         MR. BENNETT:  Because the CFPB categorization is

17    not broken down in that fashion, and the defendant had

18    never raised that suggestion to us in any of our

19    meet-and-confer discussions.

20         THE COURT:  Whether they did or didn't, I mean,

21    it seems to me like in order to tailor the discovery to

22    the allegations in the complaint, that would be a

23    reasonable narrowing, and I don't understand what you are

24    saying about the CFPB and its formats or listings.  What

25    does that mean?  Help me out with it.

1            MR. BENNETT:  Sure, Your Honor.  The consumer --

2    under the law, the consumer can make a dispute directly to

3    the credit bureaus.  The consumer can also make a

4    dispute -- it used to be the Federal Trade Commission, but

5    now they can make it to the Consumer Financial Protection

6    Bureau.

7            That dispute is then automatically forwarded to

8    Experian.  In addition, if the dispute is unheeded, then

9    the regulator can actually contact Experian directly.  So

10   the question would not be a complaint about the failure to

11   provide the social.  We don't expect that that would

12   exist, but it would be a series of consumer disputes that

13   came into Experian for which Experian then, even though it

14   could have identified the consumer, refused to conduct an

15   investigation because the consumer didn't dot every I or

16   cross every T the way Experian demanded.

17           THE COURT:  All right, I understand what the

18   difference is.  All right, the objections are overruled.

19   Answer the question as modified on the record and provide

20   the documents respecting the same.  What is the

21   correlative document request?

22           MR. BENNETT:  15 and 26.

23           THE COURT:  Is there any independent objection to

24   15 and 26, or 15 or 26?

25           MR. CLARK:  I think it's the same basis or the

1   same theory that we discussed with regard to interrogatory

2   number 11.  There is -- to the extent there is any

3   additional issue, we're sort of back to these privacy

4   concerns which --

5           THE COURT:  We'll deal with those later.

6           MR. CLARK:  Yes, sir.

7           THE COURT:  All right, now, that takes care of

8   11.  Interrogatory 15, "Identify each and every instance

9   within the five years preceding the filing of this

10  complaint in which you provided notice to a consumer that

11  you would not process his or her dispute without the

12  consumer providing additional information or

13  documentation."  Then they give you some examples.  The

14  only objection is the privacy one here.

15          MR. McLOON:  Your Honor, this is the one that,

16  when we were speaking with you by phone before, it was

17  your suggestion that we just provide the numbers, because

18  that's all that was needed for class certification, and

19  Mr. Bennett's concern was, well, he wasn't sure that we'd

20  be able to identify who it was that corresponded with the

21  number, and my representation to you then and now is, the

22  numbers we can provide we can say that we would be able to

23  provide the identification of each individual

24  corresponding to the numbers that we provide.

25          MR. BENNETT:  Your Honor, my recollection of the

1    last phone call with Your Honor was different than Mr.

2    McLOON's but you asked me, so why did we need more than

3    numbers.  I explained, as I did earlier in this call,

4    which is, this defendant's primary opposition is that you

5    could not look at these records and determine whether

6    someone is a class member, and we disagreed.

7            MR. McLOON:  That's not our position, Len.

8    That's not our position.  We have never said if you

9    looked --

10           THE COURT:  Mr. McLoon, please let him finish

11   what he was saying.

12           MR. McLOON:  I apologize, Your Honor.  I am sorry

13   to do that.

14           MR. BENNETT:  We are particularly sensitive to

15   being surprised later in class certification briefing

16   regarding claims of lack of ascertainability or

17   typicality, and we have proposed a number of stipulations

18   which relate only to what would be obtained from these

19   documents, and the defendant does not agree to those

20   stipulations.

21           There was no objection other than it would

22   violate the Fair Credit Reporting Act.  It would not have,

23   but Your Honor has already ruled and has already issued

24   the order that's in PACER that this objection is

25   overruled.  There was no burdensome, there is no scope or

1   other objection here.  We have a protective order to keep

2   all this protected.

3            THE COURT:  All right.  I've got the objection in

4   front of me.  I'm looking actually at the document filed

5   by the defendant.  I've been back through it.  The

6   objection is overruled, and you should provide that which

7   is requested in the first sentence of interrogatory number

8   15.  The example is just only for your help.

9            The next one is interrogatory 16.  "For each and

10  every instance within the five years preceding the filing

11  of this complaint in which you processed a consumer

12  dispute for a consumer who did not provide a full social

13  security number within his or her dispute, provide the

14  consumer's full name, last known address, and the dates

15  that you processed the dispute."  The objection is the

16  privacy issue.

17           MR. CLARK:  Your Honor, in our correspondence, we

18  sent a copy of the California state constitution as well

19  as a case, *Pioneer Electronics,* also out in California,

20  and we really have some concerns there.  There may very

21  well be other states with similar constitutional

22  provisions.

23           We can envision a lawsuit from consumers in

24  California or any one of those states, you know,

25  challenging us for violating these provisions, and, you

 1   know, that is a grave and serious concern.

 2           THE COURT:  Why do you need these, Mr. Bennett?

 3           MR. BENNETT:  Your Honor, these -- this is the

 4   same -- we don't need these.  We withdraw it given the

 5   Court's ruling on the previous --

 6           THE COURT:  You are withdrawing interrogatory 16;

 7   is that right?

 8           MR. BENNETT:  Yes, Your Honor.

 9           THE COURT:  All right.

10           MR. BENNETT:  I don't agree with their

11   explanation of California constitutional claim, but

12   there's no reason to fight for this one.  We have the

13   information based --

14           THE COURT:  18.  "For instances from the five

15   years preceding the filing of this complaint in which you

16   have sold a credit report to a third party where the third

17   party did not supply a social security number as part of

18   the inquiry, state the name of the consumer, the last

19   known address for that consumer, and the dates on which

20   you sold the credit file to that party."

21           MR. CLARK:  We don't understand --

22           THE COURT:  Just a minute, please.

23           MR. BENNETT:  Judge, we've asked the defendant to

24   stipulate that it does not require its customers to

25   provide a social security number in order to obtain a

1   consumer report.

2           MR. McLOON:  We have no problem with that.

3           MR. BENNETT:  Then 18 is resolved, Your Honor.

4           THE COURT:  18 has been resolved, and that is the

5   stipulation, and the stipulation is what, Mr. Bennett?

6           MR. BENNETT:  That Experian does not require its

7   customers to provide a consumer's social security number

8   in order to purchase a credit report.

9           THE COURT:  That's stipulated.  Now, to which

10  extent do document requests seven, 15, 18, 26, 28, 29, and

11  31 correlate to what I've already ruled and I don't need

12  to worry with them anymore?

13          MR. McLOON:  Seven you've already addressed, Your

14  Honor.

15          THE COURT:  What about 15, 18, 26?

16          MR. BENNETT:  26 you've already addressed.

17          THE COURT:  Where is 15?  Where is this,

18  plaintiffs' first set of request for admissions?  There's

19  no objection to that.  The objections to the request for

20  admissions start with 26.

21          MR. CLARK:  This is document request, Your Honor.

22          THE COURT:  Oh, I'm sorry.  Where are the

23  document request objections?

24          MR. CLARK:  The back.

25          MR. BENNETT:  Right after that, Judge.

```
1              THE COURT:  Seven I've already ruled on, all
2   right, and as per the discussion earlier.  The next one is
3   15.
4              MR. CLARK:  Interrogatory number 11.
5              MR. BENNETT:  We withdraw 15.
6              THE COURT:  Request number 15 is withdrawn?
7              MR. BENNETT:  Yes, Judge.
8              THE COURT:  Number 18, "Produce all dispute
9   letters sent to you by a consumer with a Virginia address
10  since January 2011."  The only objection to that is the
11  privacy.
12             MR. CLARK:  Your Honor, also it doesn't have
13  anything to do with this case.  It's not limited to the
14  issues in this case.
15             MR. BENNETT:  It is, though, reasonably
16  calculated to discover the evidence that is limited to
17  this case.
18             THE COURT:  How?
19             MR. BENNETT:  Which is -- and the defendant has
20  not objected, Your Honor, but for claiming it would
21  violate the Fair Credit Reporting Act.
22             THE COURT:  Yes.  Their only objection made is
23  the privacy objection.
24             MR. McLOON:  Your Honor, there will be thousands
25  and thousands --
```

1           THE COURT:  Mr. McLoon, you should have thought

2    about that when you wrote your objections.  You've

3    objected and -- the rule is you file your objection or you

4    lose it.  Sorry, but that's the rule.

5           MR. CLARK:  Your Honor, Joe Clark here.  We

6    objected not only on burden and scope and it being

7    overbroad --

8           THE COURT:  Where?

9           MR. CLARK:  We also objected --

10          THE COURT:  Mr. Clark, where is it?  Maybe I've

11    misread it.  Where in your objection is it?

12          MR. CLARK:  I stand corrected, Your Honor.  You

13    are correct that it is the privacy issues that we raised

14    here.  Those privacy issues, I wanted to say, go beyond

15    the FCRA.

16          THE COURT:  Okay.

17          MR. McLOON:  Your Honor, you're being asked to

18    order us to do this, and I would just urge you to consider

19    Federal Rule of Civil Procedure number one.  We're

20    being ordered to --

21          THE COURT:  Mr. McLoon, there are rules that talk

22    about how you file objections, and if you haven't filed

23    them, then they're waived.

24          MR. McLOON:  I'm asking the Court to give us

25    permission in this one case to supplement our objection

1   that these requests have nothing to do with the issues in

2   this case.  There are -- I would represent to the Court

3   I've been doing this for 20 years.  Of all of the disputes

4   we're going to receive from Virginia consumers, it would

5   be a very microscopic percentage that would have submitted

6   less than full social security numbers.

7         So you may be talking about 20,000 disputes and

8   maybe a handful, ten, 12, a dozen are going to be involved

9   in this case.  So we are producing tens of thousands of

10  letters that have nothing to do with this case, and these

11  are all having to do with the private personal information

12  of Virginia consumers.  I just don't understand why the

13  Court would order that.

14        THE COURT:  Mr. McLoon, the rules are the rules,

15  and you need to live by them.

16        MR. McLOON:  I'm asking the Court to give us

17  leave to supplement our objections to object that these

18  are not reasonably calculated to lead to discovery of

19  admissible evidence in this case, and they're burdensome.

20        THE COURT:  You've just expanded it.

21        MR. McLOON:  I apologize.  I didn't think I had.

22  That's what I was trying to convey to the Court, that

23  there would be a lot of these, and they would have nothing

24  to do with this case.  They are not limited to the issues

25  in this case.

1          THE COURT:  Mr. Bennett.

2          MR. BENNETT:  Your Honor, first of all, the

3    defendant has not even asked until now, until this moment

4    hasn't asked us --

5          THE COURT:  Mr. Bennett, he is asking for leave

6    to amend his objection in that fashion.

7          MR. BENNETT:  Your Honor, certainly we would

8    object to that at this late hour.  We would be prejudiced

9    given the commitments that we've already made and

10   telegraphed in the case.  We are deep in it with mediation

11   in two days.

12         We have -- already we're having to ask the Court

13   to enlarge discovery to permit their response, and we've

14   narrowed it to Virginia.  We've narrowed it to a narrow

15   time frame, and we've narrowed it only to those consumers

16   that are making an actual credit reporting dispute as

17   opposed to requesting copies of their credit report or --

18         THE COURT:  Well, it doesn't say that.  It says

19   all dispute letters.

20         MR. BENNETT:  Yes, Your Honor, all consumer

21   dispute letters, and the defendant's primary argument so

22   far with us offline have been the ascertainability and the

23   typicality arguments trying to piggyback on our loss in

24   Soutter, and the defendants -- and we have offered them

25   the compromise that if we did have this letter -- Mr.

1  McLoon claims it's infinitesimally small with nothing

2  other than these very generalized -- the same generalized

3  overview that you've received we get, that -- then the

4  defendant could stipulate that if they had to go through

5  and look at those letters, they would be able to identify

6  and ascertain class members who had requested --

7       MR. McLOON:  I have no problem with that.  I have

8  no problem saying that if we look at the letters we can

9  tell whether they are in the class or not.  I have no

10  problem with that.

11       MR. BENNETT:  And that you are not going to claim

12  the burden of looking at those letters as a bar to class

13  certification.

14       MR. McLOON:  Correct.

15       THE COURT:  Say it fully.

16       MR. McLOON:  That we will not argue that the

17  burden of looking at letters is a ground to deny class

18  certification and that if we did look at the letters, we

19  could figure out whether the person was in the class or

20  not.

21       THE COURT:  Do you agree with that, Mr. Bennett?

22  Do you withdraw it because of the stipulation or not?

23       MR. BENNETT:  Judge, I'd have -- if I can think

24  about the stipulation, make sure that the wordsmithing

25  that Mr. McLoon is thinking is not leaving any language

1   loophole and then provide a response after I've looked at

2   it in writing and responded.  In concept, we would agree

3   with that.

4           THE COURT:  It's tentatively withdrawn as per the

5   stipulation, wording to be determined, and you will

6   determine the wording when?

7           MR. BENNETT:  By close of business tomorrow.

8           THE COURT:  That's fine.  All right, request for

9   production number -- no, wait a minute.  Yeah, number

10  18 -- number 26, excuse me.  Please produce --

11          MR. CLARK:  We already handled that, Your Honor.

12          THE COURT:  We didn't do production 26, did we?

13  I don't think so.

14          MR. CLARK:  It relates in substance to, I

15  believe, interrogatory number 11.

16          THE COURT:  Okay, so it's tied to the ruling on

17  number 11.

18          MR. CLARK:  Yes, sir.

19          THE COURT:  All right, 28.

20          MR. BENNETT:  Yes, Your Honor.

21          THE COURT:  "Produce a copy of all letters,

22  notices, or other document, whether sent electronically or

23  hard copy, provided to any consumer in the five years

24  preceding the filing of this complaint in which additional

25  identifying information was requested before you would

1   process their dispute."

2           The objection is -- it says here that Experian

3   and plaintiffs have agreed to withdraw request for

4   production number 28 upon Experian providing a complete

5   response to number 15, and then it's objected to because

6   of the privacy rights objection.

7           MR. McLOON:  I think Your Honor has already

8   handled 15, Your Honor.

9           MR. BENNETT:  We'll withdraw 28.

10          THE COURT:  Next one is 29, "Please produce all

11  written communications received from any consumer on or

12  after December 28, 2007, for whom a disclosure log shows

13  that on or after December 28, 2007, Experian responded to

14  that communication and mailed a letter type number 066, or

15  one described in Experian's records as or with a notation

16  substantially similar to 'Letter paragraphs=Not mine or

17  non-specific disp-no SSN (066).'"

18          MR. BENNETT:  Your Honor, this is a subset of the

19  class.  There were two letters that Experian used when a

20  consumer did not have a social security number.  This was

21  one that was used more recently and much more narrowly,

22  and the disclosure log is a form that this, as you've

23  already heard from Mr. McLoon's earlier suggestions why

24  can't they produce just the disclosure log, this is a

25  document internal to Experian that it can use to narrow

1   and search to this small subset of consumers.

2          Mr. McLoon says for Virginia, for example, the

3   small fraction of the disputes or communications would

4   apply in this case.  Well, this interrogatory asks for

5   that small fraction of those consumers that Experian --

6          MR. McLOON:  Is this Virginia only?

7          MR. BENNETT:  It's not Virginia only.

8          THE COURT:  This is not tied to Virginia only.

9          MR. McLOON:  Your Honor, there are over 60,000

10  people.  We could identify in a matter of about two to

11  three minutes the list of people, but to get copies of all

12  correspondence with those people, over 60,000 people

13  that's about 20 minutes per, you are talking about 20- to

14  30,000 hours it would take.

15         MR. BENNETT:  We would agree to narrow, if they

16  give us the complete list, Your Honor, if they narrowed

17  the production of documents to just Virginia, then we

18  would agree to narrow the request, but the burdensomeness

19  objection is again as before, they didn't make that, and

20  it is not the basis for their objection.

21         MR. McLOON:  Again, Your Honor, I would request

22  leave.  60,000 people.  It's over 60,000, the number of

23  people who got that letter, and it was an error if we did

24  not object on the grounds of burden.

25         THE COURT:  Mr. McLoon, I'm not -- I'm -- I hear

1   your request, your objection, and I'm going to give Mr.

2   Bennett a chance to say what he wants to say about it.  Do

3   you have anything else to say about it, your request to

4   amend your objection?

5           MR. McLOON:  We have been talking with them about

6   this issue.  Mr. Bennett is fully aware of the process

7   which we have to retrieve hard copy of correspondence.  He

8   understands it's not something we can do on an automated

9   basis.

10          It's a manual process of finding the

11  correspondence and making a copy of it, and we've shared

12  with him going back a period of months that the number was

13  over 60,000.  It's inconceivable that he didn't understand

14  months ago that we thought this was burdensome.

15          THE COURT:  That doesn't make any difference,

16  what he understood.  It's what position you staked out.

17  All right, Mr. Bennett, what do you say?

18          MR. BENNETT:  Judge, that is not what -- I

19  certainly don't agree with Mr. McLoon when he suggests I

20  know that it's so burdensome.  In every meet-and-confer,

21  I've disagreed.  The other defendants and other defendants

22  in other cases have done it.

23          THE COURT:  Other defendants in other cases in

24  class certification have provided answers to a document --

25  responses to a document request of this sort; is that what

1   you are saying?

2            MR. BENNETT:  Yes, Your Honor.

3            MR. McLOON:  Over 60,000 people's correspondence?

4            THE COURT:  Just a minute, Mr. McLoon.  I'm

5   asking the questions now.  I did intend to ask, did it

6   involve the volume that Mr. McLoon says is involved here.

7            MR. BENNETT:  Well, it has involved much greater.

8   In the *Cappetta v. GC Services* case, 3:08CV288, Judge

9   Spencer considered exactly the same argument from a Fair

10  Credit Reporting Act defendant, GC Services, claiming it

11  had 500,000 files, and the defendant was ordered to

12  provide a mirrored copy of the database so that our

13  experts could then obtain the information, which we did,

14  and the class was certified over contest.

15           THE COURT:  Would you take that here?

16           MR. BENNETT:  We did, Your Honor.  In addition,

17  Your Honor has already --

18           THE COURT:  Wait a minute, we did.  I mean is

19  that same solution a solution to number 29 --

20           MR. McLOON:  I don't believe it's technically

21  feasible --

22           THE COURT:  Mr. McLoon, just a minute.  Let Mr.

23  Bennett answer, and then you'll have a chance.

24           MR. BENNETT:  Yes, Your Honor, we would take that

25  just as we did with the CoreLogic case where initially the

1    defendant argued that was not feasible either, and now we

2    have a mirror of that database to obtain the data we

3    received just a little bit --

4              THE COURT:  In other words, they give you a

5    database, and then you do the work of extracting the

6    letters that meet this description; is that what you are

7    saying?

8              MR. BENNETT:  Yes, Judge.  We pay for it, we have

9    the burden of putting the staff up and making it happen.

10             THE COURT:  Mr. McLoon, why can't you provide him

11   a mirror image of the database that you have that has this

12   information in it?

13             MR. McLOON:  Well, A, we're talking about

14   millions of consumers.  There is no way to do it

15   otherwise, and we are talking about essentially almost a

16   significant percentage of everyone in the United States.

17   There's no way that I'm aware of, Your Honor, to pare this

18   down to communications that relate to this lawsuit.

19             THE COURT:  You said 60,000 earlier.

20             MR. McLOON:  60,000, but the actual

21   correspondence is not sorted -- we could identify the

22   60,000 people very simply in a search, and we could give

23   them the list of names, but to go and find all of the

24   copies of correspondence from those 60,000 people, you've

25   got to be looking in a database dealing with millions and

1    millions of people, and it's one of the largest databases

2    in the world.

3           It has, you know, all of those people's personal

4    confidential information that have nothing to do with this

5    lawsuit, have never made the kind of dispute that's at

6    issue in this case are all in the same database.  It would

7    be -- A, I'd be surprised if there's many computers around

8    that Mr. Bennett has access to that could hold a database

9    that size.  You're talking about an IBM mainframe

10   computer.  It's just inconceivable to me that it could

11   technically be done.

12          THE COURT:  Well, Mr. Bennett says it can be

13   done.

14          MR. McLOON:  Mr. Bennett doesn't know our

15   computer system, Your Honor.  He's never done anything

16   like that before with our database.

17          MR. BENNETT:  Your Honor, what we could do is

18   what we did in *Cappetta*, which is we could send our

19   computer expert down.  Experian could pre-vet them, send

20   our computer expert down.

21          CoreLogic had a mainframe.  Its database was

22   similar, but the data itself can be exported in almost

23   every instance into a more conventional database format,

24   particularly when all we're talking about here are

25   archived copies of scanned documents that this defendant

1   and its staff regularly accessed when sued by these

2   consumers so they could defend and try to beat the

3   consumer's lawsuit.

4         THE COURT:  So you are prepared to send your

5   person down there and do that?

6         MR. BENNETT:  We will, Your Honor, yes.

7         THE COURT:  Any reason he can't do that, Mr.

8   McLoon?

9         MR. McLOON:  Your Honor, we can vet the person.

10  I'd be happy to have them meet with our technological

11  people and figure out if a copy could be made, but I want

12  Your Honor to understand, we think it is horribly unfair

13  to millions of people whose personal private information

14  has nothing to do with this case, millions of people, and

15  it's being handed over to third parties who we have no

16  idea who they are --

17        THE COURT:  Of course you do.  It's under a

18  protective order.  That's a disingenuous argument.

19        MR. McLOON:  Well, Your Honor --

20        THE COURT:  Mr. McLoon.  Mr. McLoon, in addition

21  to that, you have it within your wherewithal to do this

22  and to find it, and he's offering you another alternative,

23  one that has been approved by other judges in this

24  district and, frankly, one that makes sense.

25        MR. McLOON:  Your Honor, can I explain what I

1    think the differences are?

2            THE COURT:  No, Mr. McLoon, you are arguing about

3    an objection that you didn't make.  You know --

4            MR. McLOON:  We're talking about a process that

5    isn't even being requested here, Your Honor.

6            THE COURT:  He's not going -- he's offering you a

7    compromise to this.  If you don't want to do it, fine,

8    I'll rule on the request.

9            MR. McLOON:  I want the Court to understand that

10   there are over 60,000 people who will be responsive to

11   this request, and my honest, best-faith estimate is it's

12   about 15 minutes per, 15 to 20 minutes per in order to do

13   this.  And that's literally what he's asking us to do.

14           MR. BENNETT:  Mr. McLoon represented until now it

15   was 15,000, a little less.  The last time he and I were on

16   the phone together was the videoconference.  We were told

17   it was less than 15,000, and now it's apparently 60,000.

18   In reality, it might be something less once the work is

19   done.

20           MR. McLOON:  Let me check with my colleagues,

21   Your Honor.  If I'm misspeaking, I apologize.  Joe and Ed,

22   how many people got the 66 paragraphs?

23           MR. CLARK:  Right.  So 15,357.  The issue is that

24   there are different paragraphs 66, 903 --

25           MR. McLOON:  I apologize, Your Honor.  I was

1    misspeaking.

2          MR. CLARK:  There are a lot of different numbers

3    that are floating around.

4          MR. McLOON:  It is 15,000.  We're talking about

5    paragraph 66.  I misspoke on my part.

6          THE COURT:  All right, now, the objection

7    respecting privacy is overruled.  The motion verbally made

8    to include a burdensomeness objection is overruled.  It

9    wasn't an accident.  All of these objections appear here

10   about privacy, and a number of them -- and they were all

11   carefully thought out.

12         It's clear from what you all know that at the

13   time, as said here in the record, the defendant knew at

14   the time that it had some idea of the volume.  As I have

15   gotten into the volume -- I mean into these objections, it

16   seems to me they were carefully thought out, and they

17   don't include a burdensomeness objection.

18         But if I were to be considering it on the basis

19   of burden, the number of documents has been referred to as

20   60,000, and mistakenly so, and it's 15,000.  And that is

21   not an insubstantial amount of work to be done.  However,

22   given the importance of these kinds of documents to the

23   certification process, it is a reasonable thing to request

24   and get this information.  There's no objection that it's

25   not doable.

1        In addition to that, the recitation of burden

2   hasn't really been documented, whereas here the figures

3   vacillate by a factor of four.  The Court can't really

4   rely on that estimate on the basis of an -- in order to

5   give the protection sought by the defendant.

6        I think the burden -- it is true that you can't

7   push a button and get these things, but the company is in

8   litigation all the time.  It chose to keep its records in

9   this fashion, and when the time comes that a record is

10  relevant, discoverable, reasonably calculated to lead to

11  discovery of admissible evidence and it has it, then it

12  will have to pay the consequences of producing the records

13  from the system that it chose to use.  So for those

14  reasons, the objection is overruled.

15       The only question I have is whether or not there

16  was any modification to number 29 to the date.

17       MR. BENNETT:  There was not, Judge, but the

18  particular letter that's requested, the 66 letter, was not

19  used until the more recent part of the class period.

20       MR. McLOON:  I don't believe it was used until

21  2011 for the first time.

22       THE COURT:  What date are we going to use for the

23  order?

24       MR. BENNETT:  We could use January 1, 2011, Your

25  Honor.

```
 1              THE COURT:  Does that suit you?

 2              MR. McLOON:  There's going to be nothing between

 3   January and some date in July, but that's fine.

 4              MR. CLARK:  July 10th.

 5              THE COURT:  We'll just take January 1, 2011.  I

 6   think that takes care of all -- no, number 31.  31,

 7   "Please produce all emails which reference or relate in

 8   any way to this case or which contain any of the following

 9   phrases:  "Menton," "identification," "identifying

10   information," or "utility bill."

11              That is objected to as overly broad and

12   burdensome, and that's further evidence that the defendant

13   knows when to make a burdensome objection, and it made it

14   here.  Then, let's see.  Is there anything else?  I guess

15   it's all burdensomeness.

16              MR. BENNETT:  Your Honor, we agree to narrow this

17   to include specific records, possible records custodians

18   working at the supervisor or management level of the

19   national -- or the NCAC, which is the Texas dispute

20   facility, or within the Experian compliance department in

21   Costa Mesa.

22              MR. CLARK:  Your Honor, this is Joe Clark.  We

23   are running searches across email custodians based on that

24   modification.

25              THE COURT:  And?  Have you all resolved this in
```

1  that fashion?  Is that what you are saying?

2           MR. CLARK:  I believe so, Your Honor.

3           THE COURT:  So it will read, "Please produce all

4  emails which reference or relate in any way to this case

5  or which contain any of the following phrases."  Then how

6  do you modify it?  Which are in or which appear in the

7  what, the emails of who?

8           MR. BENNETT:  Within the email of supervisor or

9  management employees of Experian within either its NCAC or

10 compliance departments.

11          THE COURT:  Supervisor and management?

12          MR. BENNETT:  Yes, Your Honor.

13          THE COURT:  Do you agree to that, Mr. Clark?

14          MR. CLARK:  Yes, sir.  We're running those

15 searches at present.

16          THE COURT:  So added to the text of 31 is, which

17 appear in emails of supervisors and management in

18 Experian's NCAC facility; is that what it is?  Or

19 compliance department; is that right?

20          MR. CLARK:  Center.

21          THE COURT:  Center.  Compliance center, okay.

22 Okay.  You all have agreed to that.  All right, that takes

23 care of everything I think here.

24          Now, on these privacy objections, even though

25 they've been overruled, you have to treat them under

1   protective order, Mr. Bennett.

2           MR. BENNETT:  We understand, Your Honor.

3           THE COURT:  And if they're ever filed anywhere,

4   they have to be filed under seal or in some way to protect

5   them.

6           MR. BENNETT:  Yes, Judge.

7           THE COURT:  Is there anything else that needs to

8   be done?

9           MR. BENNETT:  No, Your Honor, I don't believe so.

10          MR. CLARK:  Not for the defense, Your Honor.

11          THE COURT:  Mr. Bennett, you can get a transcript

12  from the court reporter and -- by the way, what about the

13  dates?  What about the dates in which these amended -- I

14  mean these documents have been produced and answers have

15  to be provided?  What dates are we going to have in the

16  order?

17          MR. McLOON:  Your Honor, I don't even know how

18  many Virginia residents there are.  I wouldn't even begin

19  to be able to tell you how long it's going to take us.

20          THE COURT:  You want me to tell you, or do you

21  want --

22          MR. McLOON:  Your Honor, I'm sure Your Honor has

23  great experience in this area.  All I can represent to you

24  is that this is a manual process.  There could be tens of

25  thousands of them.

1          THE COURT:  Mr. McLoon, I don't know whether you

2   meant that specifically or not, but the fact of the matter

3   is, in the past, I have, in fact, had extensive

4   experience, both litigating over and, in fact, rooting

5   through documents of great volume, and I know there are

6   systems and ways to make it efficient and to do it

7   reasonably that can be adapted in almost any case.

8          There are professional services.  In fact, there

9   are law firms that have entire practices devoted to this,

10   and I'm sure they can help you out.

11          And before any claim of burden is made from now

12   on, maybe there will be some talking to all these people

13   and providing information that will be sufficient for the

14   Court to conclude that there actually is burden, but he

15   who cries burden too often will find that it's hard to

16   buy, particularly where, as in this instance, a number of

17   things turned out, upon close examination, not to really

18   be very burdensome at all, or if so, they're burdensome

19   within a tolerance that is appropriate given what is at

20   stake in the case.

21          Now, Mr. Bennett, have you got any ideas on the

22   dates of compliance?

23          MR. BENNETT:  Your Honor, the defendant was

24   previously representing October 4th, but if the defendant

25   had until October 13th.

MR. McLOON:  If the numbers are what I expect
they are, Your Honor, I don't believe we can completely
comply by that date.  We can do it on a rolling basis.
Until I know the numbers, I feel very uncomfortable
telling the Court that that's possible.

Now, Your Honor has great experience, and I can't
disagree with that.  I'm just telling you, I know the
system.  I've worked with it for years.  It is a manual
process, and it is time-consuming.  We're talking about
numbers of 15,000 for the letter 66, and I don't know how
many total Virginia consumers submitted disputes during
this time period, but it could be in the tens of
thousands.  It could be.

All we can do is what we can do.  We can't shut
our client's business down for two months to do this, so
we'll do the best we can.  We can start producing
almost -- within two weeks and then do our best to get it
done as quickly as possible after that.  That's all I can
say in this call.

THE COURT:  Well, I'm going to give you a
deadline of October 30 to have it all done.

MR. McLOON:  I would request, Your Honor, if we
determine the process is taking longer, that we'll come
back and work with the plaintiff to see if we can come up
with a stipulation.

1          THE COURT:  You all can do what you need to do,

2    but I have no information there's any risk of shutting

3    down Experian's business in order to do this.  Nobody has

4    made any showing to that effect.

5          MR. McLOON:  Of course I understand.  I was

6    saying there's certainly limits on what we're capable of

7    doing given practical constraints.  There's only a certain

8    number of employees who are trained to do this.  We can't

9    create new employees overnight.  It would take training

10   time and things like that.  There's just certain limits

11   we're going to have to be stuck with, and we'll do the

12   best we can within those limits.

13         THE COURT:  Mr. McLoon, in 1975, there was a

14   multidistrict litigation filed here in front of Judge

15   Merhige, and much of the same complaint that you are

16   making now was made on the basis of sort of the same kind

17   of general information, and the Judge ordered that these

18   documents, most of which were in salt mines, literally in

19   salt mines in no organized fashion, be reviewed and be

20   produced.

21         And it was represented that they'd have to be

22   special people to be able to do it, and it was represented

23   that it would take somebody with knowledge to do it and

24   every complaint known to God or man about why it couldn't

25   be done was raised.

1          But the fact of the matter is it was done, and it
2     was done by virtue of agreements between lawyers and a
3     client that wanted to end up complying with what the Judge
4     had ordered to be done and lawyers who were creative in
5     figuring out a way to do it.  In some instances, there
6     were things that actually it turned out could not be done,
7     and in other instances there were things that turned out
8     to have been thought extremely difficult of achievement
9     that really were not at all.
10          Lawyers working together -- and today there are
11     professional services available that actually have refined
12     the techniques and linked them to the modern-day world of
13     the salt mine which is the ether where the documents are
14     now held.  Your client needs to learn that it needs to
15     focus on that aspect of its responsibilities when it's in
16     litigation.  All right, that cakes care of everything.
17          Mr. Bennett, you can get a copy of the transcript
18     and send me a draft order which I'll expect will
19     faithfully indicate or reflect every ruling that has been
20     made here without any inflation or exaggeration.
21          MR. BENNETT:  Yes, Judge.
22          THE COURT:  I'll expect you to have that here
23     next week.  Thank you.  Bye-bye.
24          MR. BENNETT:  Thank you.
25

1                    (End of proceedings.)

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9    _____/s/_____              _____

10   P. E. Peterson, RPR              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25